Opinion filed August 18,
2011

 

 

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                    Nos. 11-09-00263-CR & 11-09-00268-CR 

                                                    __________

 

                               JAMAR
JAMES RENDER, Appellant

 

                                                             V.

 

                                      STATE
OF TEXAS, Appellee



 

                                   On
Appeal from the 35th District Court

 

                                                           Brown
County, Texas

 

                                       Trial Court Cause
Nos. CR19974 & CR19973

 



 

                                                                  O
P I N I O N

            In
Cause No. 11-09-00263-CR (Trial Court Cause No. CR19974), the jury convicted
Jamar James Render of aggravated assault.  The jury assessed punishment, enhanced
by a prior felony conviction, at confinement for fifteen years.  In Cause No.
11-09-00268-CR (Trial Court Cause No. CR19973), the jury convicted appellant of
manslaughter. The jury assessed punishment, enhanced by a prior felony
conviction, at confinement for thirty years.  The trial court sentenced
appellant accordingly and ordered that the sentences run concurrently.  We
affirm.

The
Charged Offenses

            In
Cause No. 11-09-00263-CR, the indictment alleged that, on or about February 28,
2008, appellant committed the offense of aggravated assault by “intentionally,
knowingly, or recklessly caus[ing] serious bodily injury to Brent McCormick
Tomlinson by hitting him in the head with his hand, a metal object or unknown
object, or by causing him to fall and hit his head, or by kicking him.”  The
jury convicted appellant of the charged offense.  In Cause No. 11-09-00268-CR,
the indictment alleged that, on or about February 28, 2008, appellant committed
the offense of murder by “intentionally or knowingly caus[ing] the death of an
individual, namely, James Lee Holland, by hitting him in the head with his
hand, a metal object or unknown object, or by causing him to fall and hit his
head, or by kicking him.”  The jury convicted appellant of the lesser included
offense of manslaughter.

Issues
on Appeal

            Appellant
does not challenge the sufficiency of the evidence to support his convictions. 
Appellant presents nine points of error for review.  In his first three points,
appellant contends that the trial court erred by admitting testimony that
violated the Confrontation Clause and that was inadmissible hearsay.  In his
fourth point, appellant contends that the trial court erred by denying his
motion to quash the indictments.  In his fifth and sixth points, appellant
asserts that the trial court erred by admitting evidence of an extraneous
assault.  In his seventh and eighth points, appellant contends that the trial
court erred by denying his requested jury instructions on self-defense. In his
ninth point, appellant argues that the trial court erred by informing the jury during
punishment deliberations that appellant’s sentences would be served
concurrently.

The
Evidence at Trial

            We
have reviewed the evidence, and we will summarize it here.  The record shows
that, during the night of February 27, 2008, appellant was involved in an
altercation with Holland and Tomlinson.  At that time, appellant lived in
apartment 1002 at the Southside Village Apartments.

            Kristi
Ramirez and Pablo Celedon lived in apartment 1006 at the Southside Village Apartments. 
Their apartment was two doors down from appellant’s apartment. Ernestina
Celedon was Pablo’s mother.  Kristi knew appellant and his girlfriend, Rebecca
York.  Kristi testified that, on February 27, 2008, Ernestina came to her
apartment.  Ernestina told her that people were fighting outside.  Kristi said
that she could hear a loud argument going on outside. Kristi and Ernestina left
the apartment to go to the store.  As she left the apartment, Kristi could
still hear people arguing.  She testified that the argument was between
appellant and Holland. Although Kristi did not know Holland at that time, she
later learned his identity.  Kristi said that she saw a hat in the middle of
the parking lot and a man lying facedown on the ground in the handicap parking
spot in front of appellant’s apartment.  The record shows that the man was
Tomlinson.  Ernestina testified that Tomlinson was shaking like he was dying
and that there was a lot of blood on the ground around him.  Kristi said that
appellant was standing in his doorway. Kristi heard appellant tell Holland that
Tomlinson was going to be okay but that he had never been hit that hard before. 
Kristi said that Holland walked away and appeared to be drunk.  Kristi called
the police.

            On
February 27, 2008, at 7:57 p.m., Brownwood Police Officer Troy Grusendorf was
dispatched to the apartment complex.  When he arrived at the complex, he saw
Holland walking across the parking lot and talking on a cell phone.  Officer
Grusendorf testified that Tomlinson was lying facedown on the pavement.  Officer
Grusendorf saw vomit and blood on the ground by Tomlinson and could smell the
odor of alcohol coming from the concrete. When Officer Grusendorf arrived,
appellant was standing over Tomlinson and shaking his shoulder to see whether
he was okay.  Officer Grusendorf testified that Michael Pierson was at the
scene. Appellant and Pierson told Officer Grusendorf that Tomlinson was
intoxicated.

            Brownwood
Police Officer Sky Self also responded to the scene.  Officer Self saw Holland
walking in the shadows.  Upon Officer Self’s request, Holland came to him.  Officer
Self said that Holland was acting extremely nervous and had alcohol on his
breath.  Holland told Officer Self that there had been an altercation.  Officer
Self drove Holland to the scene where he said the altercation had occurred.  Officer
Self said that Tomlinson was lying facedown on the pavement with blood
everywhere around him.  Officer Self said that Tomlinson was coughing and
moaning and that appellant was standing over him.

            Brownwood
Police Sergeant James Arthur Shannon also arrived at the scene.  When he
arrived, Tomlinson was lying facedown in the parking lot, and appellant and
Pierson were near him.  Sergeant Shannon said that it looked like Holland had
been in a fight and had been drinking.  Sergeant Shannon said that Holland had
an abrasion or red mark under his left eye.

            Officer
Grusendorf believed that Tomlinson had been assaulted because he had a severe
laceration on the top of his head.  Appellant told Officer Grusendorf that
nothing happened in front of his apartment.  Appellant told Officer Self that
he did not know Tomlinson and Holland.  Appellant said that Tomlinson and
Holland fought each other and that he tried to break up the fight.  He also
told Officer Self that he was trying to help Tomlinson get up.  Sergeant
Shannon spoke with appellant and Pierson and asked to see their hands for possible
injuries.  Appellant and Pierson did not have any injuries to their hands.  Sergeant
Shannon said that neither appellant nor Pierson looked like they had been in a
fight.  Sergeant Shannon said that appellant was calm and cooperative. 
Appellant told Sergeant Shannon that he heard an argument and then went outside
his apartment and saw a man on the ground.  The officers did not find any
weapon that might have been used in an assault.  They did not see any beer
bottles, broken bottles, broken glass, beer cans, or spilled liquid in the area
where they found Tomlinson.

            Roberta
Herrera, Mary Ramirez, and Fidencio Ramirez were inside appellant’s apartment
when the officers arrived at the scene.  York was appellant’s girlfriend and lived
with him.  York was not at the apartment when the incident occurred.  Sergeant
Shannon said that Herrera, Mary, and Fidencio did not have any injuries to
their hands.  They told him that they did not know anything about a fight.  Sergeant
Shannon said that a child was asleep upstairs in the apartment.

            Appellant
and Pierson went inside appellant’s apartment.  Officer Grusendorf talked with
Holland. Officer Grusendorf smelled an odor of alcohol on Holland.  Officer
Grusendorf said that Holland’s demeanor was pretty calm and that Holland
appeared to be “punch drunk.” Holland was not worried about himself but was
instead worried about Tomlinson.  Officer Grusendorf believed that Holland
might have been struck in his face because he had a mark on it. 

Officer
Grusendorf thought that Holland and Tomlinson might have fought each other. Officer
Grusendorf asked Holland what happened.  Holland told him that Tomlinson was
his boss.  Holland said that he and Tomlinson came to apartment 1002 to visit a
man who owed Tomlinson money.  Holland said that appellant punched him (Holland)
in the face and that he fell back as a result of being hit.  Holland said that
he then saw appellant punch Tomlinson in the head. Holland also told Officer
Grusendorf that “[w]e got jumped by this one.”  Officer Grusendorf
testified that, the more Holland talked, the more disoriented he became.

After
Officer Grusendorf spoke with Holland, Officer Self and Sergeant Shannon
brought appellant and Pierson out of appellant’s apartment.  Officer Grusendorf
asked Holland whether appellant or Pierson, or both of them, assaulted him.  Holland
identified appellant as the person who assaulted Tomlinson and him.  Holland
also said that appellant acted alone and that Pierson was not involved in the
assaults.  Based in part on the lack of any marks on appellant’s hands, Sergeant
Shannon did not believe that there was enough evidence to arrest appellant at
that time. 

            The
police discovered that Holland had two outstanding traffic warrants.  Officer Self
arrested Holland on the warrants and took him to jail.  Officer Self testified
that Holland was curious about whether he would be able to get out of jail that
night.  At the jail, some marihuana fell to the ground from Holland’s
possession, and Holland was charged with possession of marihuana.

            Paramedics
were dispatched to the scene. Paramedic Alvin Stewart attended to Tomlinson.  Stewart’s
initial contact with Tomlinson was at 8:10 p.m. Stewart said that there was a
puddle of vomit on the ground near Tomlinson. Tomlinson responded to Stewart
with gibberish.  Stewart testified that Tomlinson was in and out of
consciousness and that Tomlinson had a laceration on the back of his head.  Tomlinson
was transported to the emergency room at Brownwood Regional Medical Center.

            Tara
Holland was Holland’s wife.  Tara testified that Holland worked on an oil rig
and that Tomlinson was his boss.  Cell phone records that were introduced into
evidence showed that there were a number of calls between Tara and Holland on
the night of the incident.  Specifically, the calls were made at 6:24 p.m.,
6:29 p.m., 7:19 p.m., 7:41 p.m., and 7:54 p.m. Tara testified about the calls. 
She said that, during the 6:24 p.m. call, Holland told her that he was going to
appellant’s apartment with Tomlinson so that he would not get hurt.  Tara
testified that appellant owed Tomlinson $80 and that Holland did not want
Tomlinson to go to appellant’s apartment by himself.  During the 6:29 p.m.
call, Holland told Tara that they were pulling up to appellant’s apartment.  Holland
also told her that he and Tomlinson had received a call from appellant and that
appellant said that he had the $80.  Tara said that Holland did not answer when
she called him at 7:19 p.m.  She said that, at 7:41 p.m., Holland called her
and told her that he and Tomlinson had been beaten and were hurt.  Holland
asked her to come and get them.  During the 7:54 p.m. call, Holland told Tara that
he was lying on top of Tomlinson and that Tomlinson was hurt.  Tara testified
that, during the 7:54 p.m. call, she heard appellant talking in the background
and heard Holland tell appellant, “You just f---ed up.”    

Tara
went to the apartment complex.  She saw Holland in the backseat of a police
car. Tara said that Holland’s face was bleeding.  Tomlinson was lying in the
parking lot.  He was not moving, and there was a lot of blood around him.  Tara
said that the officers took Holland out of the police car and that he pointed
to appellant.  Tara left the scene after Tomlinson was put in the ambulance.

Holland’s
condition deteriorated at the jail.  He had a seizure.  Paramedic Stewart went
to the jail to transport Holland to the emergency room at Brownwood Regional
Medical Center. Stewart’s initial contact with Holland at the jail was at 12:16
a.m.  Stewart testified that Holland had a knot on the top of his head. 
Stewart said that Holland was totally unresponsive and that his breathing
became distressed on the way to the hospital.  Holland was intubated at the
hospital.  Officer Grusendorf went to the hospital to see Holland.  Officer
Grusendorf said that, at that time, Holland was “a totally different person.”  Officer
Grusendorf said that Holland was on a ventilator and had slipped into a
comatose state.  Later, Holland was taken by helicopter to Baylor University
Medical Center in Dallas, where he passed away the next night.

After
seeing Holland at the hospital, Officer Grusendorf went to appellant’s
apartment and talked with appellant.  Appellant initially falsely identified
himself to Officer Grusendorf as Jamar “Warren.”  Officer Grusendorf then
obtained a social security number from appellant and learned his true
identity.  Appellant had three outstanding warrants, and Officer Grusendorf
took him into custody.

Brownwood
Police Detective Robert Mullins went to the apartment complex the morning after
the incident.  He searched the area around appellant’s apartment and also
looked in the dumpsters near the apartment.  He did not find any weapons or
anything indicating that an assault had taken place.  Detective Mullins did not
see any broken bottles, beer bottles, or beer cans in the area around
appellant’s apartment.  He also did not see any damage or stains on appellant’s
apartment door. Later that day, Detective Mullins spoke with appellant. Detective Mullins
gave appellant his Miranda[1]
warnings.  Appellant indicated that he understood the warnings, and he
signed a waiver of his rights.  Appellant told Detective Mullins that he did
not understand why he was in jail because he had not done anything wrong.  Appellant
told Detective Mullins that he did not know Holland and Tomlinson.

            Detective
Mullins met with Pierson, Herrera, Mary, and Fidencio.  They were inside
appellant’s apartment when the incident occurred.  Detective Mullins said that
their stories were somewhat consistent.  They said that they did not know
anything about a fight.  They also said that they were told someone was lying
down in the parking lot.  Detective Mullins also spoke with Tomlinson’s wife,
Candice Tomlinson. Candice told him that Tomlinson went to appellant’s
apartment in an attempt to collect money.  Detective Mullins spoke with
Tomlinson on March 11, 2008.  Tomlinson had no recollection of the incident.  Detective
Mullins also met with Holland’s wife, Tara.  Detective Mullins said that he and
Tara discussed the phone calls that had taken place between Holland and her on
the night of the incident.

Detective
Mullins testified that Tomlinson’s medical records from the hospital for the
date of the incident showed that he had a blood alcohol level of .169.  Detective
Mullins said that Tomlinson was obviously intoxicated at that time.

Pierson
testified that he and his girlfriend, Herrera, sometimes visited appellant at
his apartment.  Pierson said that he did not know Holland or Tomlinson.  Pierson
said that, on the date of the incident, he, Herrera, Fidencio, Mary, appellant,
and appellant’s son were at the apartment.  Pierson said that, at about 8:00
p.m., the people inside appellant’s apartment “heard something thrown at the
door” that sounded like a hard knock.  Pierson said that appellant was upstairs
taking care of his son.  According to Pierson, appellant said, “Well, it’s a
beer bottle getting thrown at the door.”  Pierson testified that appellant went
outside and shut the door behind him.  About five or ten minutes later,
appellant came back inside and told Pierson “to go outside to help pick this
guy up.”  Pierson said that a man was lying down in a handicap parking spot
with a pool of blood around his head.  Pierson testified that he and appellant
tried to put the man inside his truck and that the man threw up when they
picked him up.  Pierson said that he did not ask appellant what had happened to
the man.  Pierson said that he did not hear fighting or yelling when appellant
went outside.

            Pierson
testified that police officers arrived at the scene when he was helping
appellant pick up the man.  The police had a man in a police car.  Pierson said
that the police got the man out of the car and had the man look at appellant
and him.  Pierson said that the man pointed at appellant and that the man told
the police he (Pierson) did not have anything to do with it.  Pierson testified
that he and appellant went inside appellant’s apartment after the police left
and that they did not talk about what had happened. 

            Herrera
was in appellant’s apartment when the incident occurred.  She said that she
heard what sounded like a glass bottle hitting the door.  She also said that it
sounded like someone had tossed it “lightly.”  Appellant went outside to see
about the noise.  Herrera said that, about five minutes later, appellant came
back inside and went upstairs.  Herrera said that appellant went back outside. 
Herrera said that she did not hear anything coming from outside when appellant
was outside.  About ten minutes later, appellant came inside and told Pierson
to go outside to help pick up somebody.  Herrera said that the police officers
came into the apartment.  Herrera said that, upon the officers’ request, she,
Fidencio, and Mary showed the officers their hands. Herrera testified that she
did not know what happened outside the apartment.  After the officers left, appellant
and Pierson did not say anything about what had happened.  Herrera said that
she never asked appellant what had happened.  Herrera testified that appellant
did not look like he had been in a fight.  Herrera did not see any evidence
that a fight had taken place.  She did not see a bottle or any broken glass. 
Herrera said that the police later came back to the apartment and arrested
appellant.

            Fidencio
testified that he and appellant were friends.  Fidencio said that he and his
wife, Mary, were sitting on the couch in appellant’s apartment when they heard
a bottle hit the door.  He said that appellant went to the door.  Fidencio
testified that appellant went outside for about twenty seconds.  Fidencio said
that he did not hear any kind of disturbance going on in the parking lot.  He said
that appellant did not tell Pierson to come outside.  Fidencio said that the
police came inside the apartment and looked at everybody’s hands.  He also said
that, after the police left, the people inside the apartment did not talk about
what had happened.

Tomlinson
testified that he previously worked on a pulling unit in the oil field
business. He said that he met appellant about three weeks before the incident. 
He said that appellant asked him for a job on one occasion but that he did not
have any available work at that time.  Tomlinson said that he cannot recall
anything that happened for about two weeks leading up to the incident and that
he does not remember the incident.  About three weeks after the incident, he
realized that something had happened to him.  He said that he sustained
shattered bones in the left side of his face during the incident.  After the
incident, he had a subdural hematoma.

            Candice
testified that, about a week or two before the incident, appellant came to her
house and told Tomlinson that he needed more time to pay back the money.  After
the incident, Brandy Smith, who was Tara’s sister, told Candice that Tomlinson
had been injured.  Candice went to the hospital.  She said that it looked like
Tomlinson had been “beaten to a pulp.”  Tomlinson was taken by helicopter to
Hendrick Medical Center in Abilene.  Candice said that Tomlinson did not
remember the incident.

Pablo
testified that he and appellant were neighbors for about six months.  Pablo
testified that Kristi called him and said that people were fighting outside the
apartments.  After receiving Kristi’s call, Pablo went to his and Kristi’s
apartment.  The police officers left the scene before Pablo arrived at the
apartments.  Pablo testified that appellant was standing at his doorstep and
looked worried.  Appellant called Pablo over to him.  Pablo said that appellant
told him what had happened.  According to appellant, a couple of guys came to
his apartment and asked him for a beer.  Appellant said that the two guys ended
up with a beer and threw it at his door.  Appellant also told Pablo that the
men made gestures at him and called him names.  Pablo testified that he saw a
“beer splatter” on appellant’s door.  Appellant told Pablo that “[h]e hit one
time” and the guy “went straight to the ground.”  Pablo said that there was a
big pool of blood on the street.  Appellant said that the men came toward him
and that he reacted by hitting both of them with his hand.  Appellant told
Pablo that he knocked one of the guys out with one punch.  Pablo gave a
statement to the police.  In his statement, Pablo said that appellant “started
bragging about how the police didn’t think it was him.”

Stephen
Atkins lived at the Southside Village Apartments on the date of the incident.  He
said that he was outside when the incident started.  Atkins said that he saw a
pickup pull up to appellant’s apartment.  He said that two guys got out of the
pickup and then banged on appellant’s door.  According to Atkins, appellant
answered the door and then an argument started between appellant and the men.  Atkins
testified that he did not have a good view of the incident. However, he said
that one of the men “buckled up” like he wanted to have an altercation with
appellant.  Atkins said that appellant pushed the man away.  Atkins said that
he then went inside his apartment and told his wife, “I think they are going to
fight out there.”  Atkins said that he did not see anything else after going
inside his apartment.

            Royce
Gober testified that he was in jail in February 2008.  Gober heard appellant
tell someone that, while he was at home watching his child, he heard a
commotion outside.  Appellant said that he went outside and saw one man on the
ground and another man walking away.  Appellant said that he tried to pick up
the man from the ground.  Appellant also told the individual that he did not
have anything to do with the fight.

Brandon
Clark was a jailer at the Brown County Jail.  Appellant was in jail on June 18,
2008.  Clark testified that there was an incident involving appellant on that
date.  Appellant was upset about the television in his cell being turned off.  Clark
testified that he listened to a conversation between appellant and another
inmate on the intercom.  Clark testified that appellant told the other inmate
that the officers “need[ed] to quit f---ing with him”; that “he had done beat
one person to death and he would do it again”; and that, “if the officers [did]
not quit f---ing with him[,] he [would] f---ing show them.”  Clark testified
that appellant told the other inmate that his hands were lethal weapons.      

Pedro
Delarosa and appellant had been cellmates in jail.  Delarosa had known
appellant before they were in jail together.  He also had known Holland and
Tomlinson.  Delarosa testified that appellant told him that appellant sold
Tomlinson and Holland drugs and that they were unhappy with the drugs.  Appellant
said that Tomlinson and Holland beat and kicked his apartment door and threw beer
bottles at it.  Appellant told Delarosa that he, Tomlinson, and Holland all
threw blows.  Appellant said that he hit Tomlinson and Holland in defense.  
According to Delarosa, appellant said that he hit Holland and that Holland then
ricocheted off a vehicle, fell, and hit his head on a curb or parking block.  According
to Delarosa, appellant also said that he hit Tomlinson and that Tomlinson then
became dazed and took off.  Apparently, Delarosa referred to Holland as
Tomlinson and Tomlinson as Holland by mistake because the evidence showed that
Tomlinson was lying facedown in the parking lot and that Holland walked away after
the altercation.                               

            The
State presented detailed medical evidence about Holland’s and Tomlinson’s
injuries.  Michael Lyons, M.D. treated Tomlinson in the emergency room at the
Brownwood Regional Medical Center.  Tomlinson was uncooperative and unable to
provide any coherent information.  He had bruising around both eyes and a
laceration on his head.  A CAT scan showed that Tomlinson had a subdural
hematoma times two.  He had fractured bones on the left side of his face.  He
was transferred to Hendrick Medical Center.  Dr. Lyons also treated Holland.  Holland
was brought to the emergency room with a complaint of seizures.  Dr. Lyons said
that Holland was unresponsive and stopped breathing.  Holland was intubated. 
Dr. Lyons said that Holland had a fairly large epidural hematoma on the right
side of his brain and that he had a right to left shift of the brain.  Dr.
Lyons said that Tomlinson had a blood alcohol level of about .13 and that
Holland had a blood alcohol level of about .01.

            Dr.
Janis Townsend-Parchman testified that she was a medical examiner for Dallas
County.  She performed an autopsy on Holland.  She described in detail
Holland’s head injuries. She said that he had injuries that were consistent
with having received three separate blows to the head.  Dr. Townsend-Parchman
testified that Holland died as a result of blunt force head injuries. She said
that blunt force injuries can be caused when an individual gets hit with a
blunt instrument or when an individual hits a blunt instrument.  Dr. Townsend-Parchman
explained that, if someone gets into a scuffle and gets pushed down, the ground
can serve as a blunt instrument.  She testified that the blunt force head
injuries that caused Holland’s death could have been caused by him falling and
hitting the ground or by him being struck in the head with a relatively broad
object, such as a fist.  She said that there is no way to determine whether those
injuries were caused by a fall or from an object striking his head.

            Dr.
Lee Ann Grossberg testified as a defense expert.  She was a forensic
pathologist.  Dr. Grossberg testified in detail about Tomlinson’s and Holland’s
injuries.  She said that the injury to the right side of Tomlinson’s head was
his most serious injury and was most consistent with a fall.  Dr. Grossberg
also said that the most likely cause of the injury to the right side of
Holland’s head was a fall to a very hard surface.

            The
State called Raymond Aaron Laviolette to testify about an extraneous assault. 
Laviolette testified that he and appellant had been neighbors at the Driftwood
Apartments in 2007.  Laviolette testified about an incident that involved appellant
and a man named “Mike.” Laviolette did not know Mike’s last name.  The incident
occurred during the summer of 2007.  Laviolette said that he and others were
playing volleyball and drinking beer outside at the Driftwood Apartments.  Mike
left one of the apartments and walked away with his bike.  Laviolette said that
somebody “popped off” about the way Mike was dressed.  Mike responded that he
knew karate.  When Mike got to the end of the street, he yelled something.  Appellant
asked the group drinking and playing volleyball whether they wanted him to hit
Mike.  Laviolette testified that everybody responded, “Yeah, go hit him.”  Laviolette
testified that appellant went to Mike and “smacked him.”  Laviolette said that
appellant hit Mike hard in the mouth and that Mike went down to the ground.  Laviolette
said that appellant’s knuckle was “busted open” after he hit Mike.




 

Confrontation
Clause and Hearsay Issues

            In
his first three points of error, appellant argues that the trial court erred in
admitting Officer Grusendorf’s testimony as to the statements Holland made to
him about the altercation involving appellant, Holland, and Tomlinson.  Specifically,
in his first point, appellant complains that Officer Grusendorf’s testimony
violated his rights under the Confrontation Clause.  In his second point,
appellant contends that the State failed to meet its burden to show that the
testimony was admissible under the Confrontation Clause.  In his third point,
appellant contends that Officer Grusendorf’s testimony was inadmissible
hearsay.

            At
trial, appellant objected to Officer Grusendorf’s testimony about Holland’s
statements on Confrontation Clause and hearsay grounds.  The State argued that the
Confrontation Clause did not bar Officer Grusendorf’s testimony for two reasons. 
First, the State argued that Holland’s statements were “akin to dying
declarations.”  Second, the State argued that appellant had waived his right to
confront Holland based on the doctrine of forfeiture by wrongdoing.  The trial
court found that the State met its burden of showing that appellant had
forfeited by wrongdoing his right to confront Holland and that, therefore, the
Confrontation Clause did not bar Officer Grusendorf’s testimony.  The trial
court also found that Holland’s statements were not dying declarations.  With
respect to appellant’s hearsay objections, the trial court found that Holland’s
statements satisfied multiple hearsay exceptions.  Therefore, the trial court
admitted Officer Grusendorf’s testimony.

Generally,
we review a trial court’s decision to admit evidence under an abuse of
discretion standard.  Wall v. State, 184 S.W.3d 730, 743 (Tex. Crim.
App. 2006); Angleton v. State, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998). 
However, in reviewing a Confrontation Clause objection, we review the
constitutional ruling de novo.  Wall, 184 S.W.3d at
742-43.                   

            The
Confrontation Clause of the Sixth Amendment provides a right in both federal
and state prosecutions to confront and cross-examine adverse witnesses.  U.S.
CONST. amends. VI,  XIV; Pointer v. Texas, 380 U.S. 400, 406
(1965); Woodall v. State, 336 S.W.3d 634, 641 (Tex. Crim. App. 2011). 
The principal concern of the Confrontation Clause is to ensure the reliability
of the evidence against a criminal defendant by subjecting it to rigorous
testing in the context of an adversary proceeding before the trier of fact.  Maryland
v. Craig, 497 U.S. 836, 845 (1990).  Whether a statement is admissible under
the rules of evidence and whether that same statement is admissible under the
Confrontation Clause are separate questions.  Crawford v. Washington,
541 U.S. 36, 50-51 (2004); Wall, 184 S.W.3d at 734-35.  Thus, even when
a statement offered against a defendant is admissible under evidentiary rules, the
statement may implicate the Sixth Amendment’s Confrontation Clause.  Gonzalez
v. State, 195 S.W.3d 114, 116 (Tex. Crim. App, 2006); Clark v. State,
282 S.W.3d 924, 930 (Tex. App.—Beaumont 2009, pet. ref’d).  

The
Confrontation Clause bars the admission of out-of-court testimonial statements
of a witness unless the witness is unavailable to testify and the defendant had
a prior opportunity to cross-examine the witness.  Crawford, 541 U.S. at
53-54; Wells v. State, 241 S.W.3d 172, 174-175 (Tex. App.—Eastland 2007,
pet. ref’d).  Post-Crawford, the threshold question in any Confrontation
Clause analysis is whether the statements at issue are testimonial or
nontestimonial in nature.  Campos v. State, 256 S.W.3d 757, 761 (Tex.
App.—Houston [14 Dist.] 2008, pet. ref’d); Wells, 241 S.W.3d at 175.  Generally,
a statement is testimonial when the surrounding circumstances objectively
indicate that the primary purpose of the interview or interrogation is to
establish or prove past events potentially relevant to later criminal
prosecution.  Davis v. Washington, 547 U.S. 813, 822-23 (2006); De La
Paz v. State, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008).  In such
circumstances, the person offering information is literally bearing testimony. 
De La Paz, 273 S.W.3d at 680.  In the context of police inquiries, out-of-court
statements made to police are not considered testimonial if they are made to enable
police assistance to meet an ongoing emergency.  However, they are considered
testimonial if there is no such ongoing emergency, and the primary purpose of
the police interrogation is to establish or prove past events potentially
relevant to later criminal prosecution. Davis, 547 U.S. at 822; Langham
v. State, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010); Vinson v. State,
252 S.W.3d 336, 338 (Tex. Crim. App. 2008).

According
to Officer Grusendorf, Holland said that he and Tomlinson went to apartment
1002 to visit a man who owed Tomlinson money, that appellant punched him in the
face, that appellant punched Tomlinson in the head, and that he and Tomlinson
“got jumped” by appellant.  At trial, the State did not assert, and the trial
court did not conclude, that Holland’s statements to Officer Grusendorf were
nontestimonial.  The evidence shows that no ongoing emergency existed when
Holland made the statements to Officer Grusendorf.  Instead, the statements
were made to establish or prove past events potentially relevant to a later
criminal prosecution.  As such, Holland’s statements were testimonial in
nature.  Davis, 547 U.S. at 822.

The
United States Supreme Court has recognized two common-law exceptions to a
defendant’s right of confrontation: dying declarations and forfeiture by
wrongdoing.  Giles v. California, 554 U.S. 353, 358-59 (2008).  In this
case, the State argues that appellant forfeited his constitutional right to
confront Holland by killing him.  The rule of forfeiture by wrongdoing
extinguishes confrontation claims on equitable grounds.  Davis, 547
U.S. at 833; Crawford, 541 U.S. at 62.  Forfeiture by wrongdoing is a
common-law rule that permits the introduction of statements of a witness who is
detained or kept away from trial by the means or procurement of the defendant. 
Giles, 554 U.S. at 359.  Under the rule of forfeiture by wrongdoing, a
defendant forfeits the right to confront a witness if he engages in wrongful
conduct that is designed to prevent the witness from testifying.  Id. at
360.  A defendant does not forfeit the right of confrontation by merely
engaging in conduct that causes the witness to be absent.  Rather, to establish
a forfeiture of the right, it must be shown that the defendant engaged in wrongful
conduct specifically for the purpose of preventing the witness from
testifying.  Id. at 361; Davis v. State, 268 S.W.3d 683, 706
(Tex. App.—Fort Worth 2008, pet. ref’d).

The
State presented evidence that appellant killed Holland.  However, there is no
evidence that appellant killed Holland to prevent him from testifying.  To the
contrary, the evidence shows that appellant allowed Holland to walk away after
the altercation.  Holland’s injuries did not appear to be life-threatening when
the officers arrived at the scene, when he talked to the officers at the scene,
or when he was taken to jail.  The record does not support a finding that
appellant killed Holland with the intent to prevent him from testifying.  Therefore,
the trial court erred by ruling that appellant forfeited his right to confront
Holland and by admitting evidence of Holland’s statements. 

We
note that the trial court correctly found that Holland’s statements to Officer Grusendorf
did not fall within the dying declarations exception to the right of
confrontation.  The dying declarations exception has historically applied to
“declarations made by a speaker who was both on the brink of death and aware
that he was dying.”  Giles, 554 U.S. at 358.  At the scene, neither the
officers nor Holland believed that he had serious injuries.  The evidence
belies the contention that he was aware he was dying when he made the
statements to Officer Grusendorf.

Error
in admitting evidence in violation of the Confrontation Clause is
constitutional error and, therefore, subject to a harm analysis under Rule 44.2(a)
of the Texas Rules of Appellate Procedure.  Tex.
R. App. P. 44.2(a); Langham, 305 S.W.3d at 582. Under Rule
44.2(a), we must reverse a judgment of conviction unless we determine beyond a
reasonable doubt that the error did not contribute to the conviction.  Rule 44.2(a). 
The following factors are relevant to determining whether constitutional error
under Crawford may be declared harmless beyond a reasonable doubt: (1)
the importance of the out-of-court statement to the State’s case; (2) whether
the statement was cumulative of other evidence; (3) the presence or absence of
evidence corroborating or contradicting the statement on material points; and
(4) the overall strength of the State’s case.  Scott v. State, 227
S.W.3d 670, 690 (Tex. Crim. App. 2007); Davis v. State, 203 S.W.3d 845,
852 (Tex. Crim. App. 2006); Wells, 241 S.W.3d at 177.  

            The
emphasis of a harm analysis under Rule 44.2(a) should not be on the propriety
of the outcome of trial.  Scott, 227 S.W.3d at 690.  Rather, we must
determine whether the error adversely affected the integrity of the process
leading to the conviction.  Id.  The question for the reviewing court is
not whether the jury verdict was supported by the evidence.  Id. 
Instead, the question is the likelihood that the constitutional error was
actually a contributing factor in the jury’s deliberations in arriving at the
verdict.  Id.  In performing a harm analysis, a reviewing court may also
consider the source and nature of the error, the amount of emphasis by the
State on the erroneously admitted evidence, and the weight the jury may have
given the erroneously admitted evidence compared to the balance of the evidence
with respect to the element or defensive issue to which it is relevant.  Id.   
  

With
the above considerations in mind, we must determine whether there is a
reasonable possibility that the Crawford error moved the jury from a
state of non-persuasion to one of persuasion on a particular issue.  Scott,
227 S.W.3d at 690; Davis, 203 S.W.3d at 852-53. Ultimately, if we are to
affirm, we must be satisfied beyond a reasonable doubt, after considering the
various factors, that the error did not contribute to the conviction.  Scott,
227 S.W.3d at 690-91.

Holland’s
statements were important to the State’s case because they provided evidence
that appellant was involved in an altercation with Tomlinson and him, that appellant
was the aggressor, and that appellant assaulted both of them.  Holland’s
statements contradicted appellant’s claims to the police that he was not involved
in an altercation and that Holland and Tomlinson fought each other.  However,
Holland’s statements were cumulative of, and corroborated by, other testimonial
evidence and were consistent with physical evidence showing that he and
Tomlinson had been assaulted.

Kristi
heard a loud argument going on between appellant and Holland, and she saw
Tomlinson lying on the ground.  She also heard appellant tell Holland that
Tomlinson had never been hit that hard before.  On the night of the altercation,
appellant told Pablo that he hit both Holland and Tomlinson.  Appellant also
told his cellmate, Delarosa, that he hit Holland and Tomlinson.  Clark, the
jailer, heard appellant tell another inmate that he had beaten one person to
death and that he would do it again.  Pierson testified that appellant went
outside his apartment and then, about five or ten minutes later, asked him to
help pick up Tomlinson.  Herrera gave similar testimony.  Appellant called Atkins
as a witness.  Atkins testified that appellant got into an argument with
Holland and Tomlinson.  This evidence is cumulative of, and corroborates,
Holland’s statements that appellant assaulted Tomlinson and him.  The injuries
sustained by Holland and Tomlinson were consistent with both of them being hit
in the head.  Witnesses described the injuries in detail, and the State also
introduced medical records into evidence that established the nature of those
injuries.  Viewing all the evidence, including appellant’s admissions that he
hit Holland and Tomlinson, we conclude that the State presented a strong case
of appellant’s guilt.

Although
appellant told the police that he was not involved in an altercation, he
claimed at trial that he was acting in self-defense when he hit Holland and
Tomlinson.  Holland’s statements, if believed, established that appellant was
the aggressor in the altercation.   

Appellant
relied on other testimony in an attempt to establish that Holland and Tomlinson
were the aggressors.  According to Pablo, appellant told him that Holland and
Tomlinson came toward him and that he reacted by hitting both of them.  According
to Delarosa, appellant told him that he hit Holland and Tomlinson in defense.  Atkins
said that one of the men “buckled up” as if he wanted to fight appellant.  Pierson
testified that something was thrown at appellant’s apartment door.  Herrera and
Fidencio testified that they heard what sounded like a bottle hit appellant’s
apartment door.  While this testimony, if believed, might provide some support
for appellant’s claim that he acted in self-defense, the State presented
evidence, as detailed above, corroborating Holland’s statements and
establishing the nature of Holland’s and Tomlinson’s injuries.  Because
Holland’s statements were cumulative of, and corroborated by, other evidence, we
conclude that the evidence of Holland’s statements would not have materially
affected the jury’s deliberations on appellant’s self-defense issues.

After
carefully reviewing the record, we conclude beyond a reasonable doubt that the
error in admitting Holland’s statements did not contribute to appellant’s
conviction or punishment.  Therefore, the error was harmless.  Appellant’s
first two points of error are overruled.         

Based
on our ruling on appellant’s first two points of error, we need not decide whether
Officer Grusendorf’s testimony as to Holland’s statements was also inadmissible
as hearsay.  A violation of the evidentiary rules resulting in the erroneous
admission of evidence is nonconstitutional error and is, therefore, subject to
a harm analysis under Rule 44.2(b).  Motilla v. State, 78 S.W.3d
352, 355 (Tex. Crim. App. 2002); Gately v. State, 321 S.W.3d 72, 77
(Tex. App.—Eastland 2010, no pet.).  Under Rule 44.2(b), we are to disregard
any error unless it affected the defendant’s substantial rights.  We have
concluded that the trial court’s error in admitting Holland’s statements was
harmless under the more stringent standard imposed by Rule 44.2(a) for
analyzing harm of constitutional errors.  Therefore, even assuming that
Holland’s statements were also inadmissible hearsay under the Rules of
Evidence, we need not conduct a separate harm analysis under the less stringent
standard imposed by Rule 44.2(b) for analyzing harm of nonconstitutional
errors.  Guidry v. State, 9 S.W.3d 133, 151 n.14 (Tex. Crim. App. 1999). 
Appellant’s third point of error is overruled.

Evidence
of Extraneous Assault

            Appellant
argues in his fifth and sixth points of error that the trial court erred by
admitting evidence of the assault that he allegedly committed against “Mike.”  In
his fifth point, appellant contends that evidence of the extraneous assault was
inadmissible under Rule 404 of the Rules of Evidence.  See Tex. R. Evid. 404.  In his sixth point,
appellant contends that evidence of the extraneous assault was inadmissible under
Rule 403 of the Rules of Evidence because the probative value of the evidence
was substantially outweighed by the danger of unfair prejudice.  See Tex. R. Evid. 403.

            As
stated above, we review a trial court’s decision to admit evidence under an
abuse of discretion standard.  Wall, 184 S.W.3d at 743; Angleton,
971 S.W.2d at 67.  A defendant’s prior crimes or bad acts are generally
inadmissible to prove that he has a bad character or a propensity to commit the
offense charged.  Robinson v. State, 844 S.W.2d 925, 928 (Tex. App.—Houston
[1st Dist.] 1992, no pet.).  Such evidence, however, may be admissible for
other purposes, such as proof of motive, intent, plan, knowledge, or lack of
mistake or accident.  Rule 404(b).  The “other purposes” listed in Rule 404(b) are
not exclusive or exhaustive but are merely representative.  Robinson,
844 S.W.2d at 929.  When an accused raises a self-defense theory, the State may
introduce evidence of prior violent acts where the accused was an aggressor in
order to show his intent and to rebut the defense.  Halliburton v. State,
528 S.W.2d 216, 218 (Tex. Crim. App. 1975); Jones v. State, 241 S.W.3d
666, 669 (Tex. App.—Texarkana 2007, no pet.); Robinson, 844 S.W.2d at
929. 

Appellant’s
counsel asserted during opening statement that appellant had acted in
self-defense.  Appellant attempted to establish that Holland and Tomlinson were
the aggressors in the altercation and that he was merely defending himself.  The
State called Laviolette as a rebuttal witness.  He testified about appellant’s
prior assault of “Mike.”  Evidence of appellant’s assault of Mike was
admissible under Rule 404(b) to show appellant’s intent and to rebut his theory
of self-defense.  Jones, 241 S.W.3d at 669-70; Robinson, 844
S.W.2d at 929.  Appellant’s fifth point of error is overruled.

Under
Rule 403, relevant evidence may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice.  Rule 403 favors admission of
relevant evidence and carries a presumption that relevant evidence will be more
probative than prejudicial.  Hayes v. State, 85 S.W.3d 809, 815
(Tex. Crim. App. 2002).  Evidence is unfairly prejudicial when it has an undue
tendency to suggest an improper basis for reaching a decision.  Reese v.
State, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000).  A Rule 403 analysis by
the trial court should include, but is not limited to, the following
considerations:  (1) the probative value of the evidence; (2) the potential of
the evidence to impress the jury in some irrational, indelible way; (3) the
time the proponent needs to develop the evidence; and (4) the proponent’s need
for the evidence.  Erazo v. State, 144 S.W.3d 487, 489 (Tex. Crim. App.
2004).  In evaluating a trial court’s determination under Rule 403, a reviewing
court is to reverse the trial court’s judgment “rarely and only after a clear
abuse of discretion.”  Mozon v. State, 991 S.W.2d 841, 847 (Tex. Crim.
App. 1999).

            In
this case, the extraneous assault is similar to the charged offenses.  Laviolette
testified that appellant took “Mike” to the ground with one punch to the mouth. 
If believed, Laviolette’s testimony showed that appellant acted as an aggressor
and violently assaulted “Mike.”  The extraneous assault occurred only about six
months before appellant’s altercation with Holland and Tomlinson.  Evidence of
appellant’s prior assault of “Mike” had high probative value on the issue of
whether appellant was the aggressor in his altercation with Holland and
Tomlinson.  The trial court gave the jury an appropriate limiting instruction
under Rule 404(b) before Laviolette testified about the extraneous assault.  The
trial court also included appropriate extraneous offense instructions in the
charge.  The limiting instructions given by the trial court likely eliminated
any potential that the extraneous offense evidence would impress the jury in
some irrational, indelible way.  Laviolette’s testimony did not take a
significant amount of time.  The State needed to present the evidence to rebut
appellant’s claim of self-defense.  After balancing the Rule 403 factors, we
conclude that the trial court could have reasonably determined that the
probative value of the evidence of the extraneous assault was not substantially
outweighed by the danger of unfair prejudice.  The trial court did not abuse
its discretion by admitting the evidence.  Appellant’s sixth point of error is
overruled.                             

Appellant’s
Requested Jury Instructions on Self-Defense

Appellant
contends in his seventh and eighth points of error that the trial court erred
by denying his requests for jury instructions (1) that a person’s belief that
the use of force against another is immediately necessary is presumed to be
reasonable if the person knew or had reason to believe that the other person
was attempting to commit robbery or aggravated robbery and (2) that a
person’s belief that the use of deadly force against another is immediately
necessary is presumed to be reasonable if the person knew or had reason to
believe that the other person was attempting to commit robbery or aggravated
robbery.

A
trial court must charge the jury fully and affirmatively on the law applicable
to every issue raised by the evidence.  Tex.
Code Crim. Proc. Ann. art. 36.14 (Vernon 2007).  If evidence from any
source raises a defensive theory, it must be included in the court’s charge.  Ferrel
v. State, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001); Taylor v. State,
856 S.W.2d 459, 470-71 (Tex. App.—Houston [1st Dist.] 1993), aff’d, 885
S.W.2d 154 (Tex. Crim. App. 1994).  A defendant is entitled to an instruction
on self-defense if the issue is raised by the evidence regardless of whether
that evidence is strong, weak, unimpeached, or contradicted and regardless of
what the trial court may think about the credibility of the defense.  Walters
v. State, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007); Ferrel, 55
S.W.3d at 591.  However, if the evidence, viewed in the light most favorable to
the defendant, does not establish self-defense, the defendant is not entitled
to an instruction on the issue.  Ferrel, 55 S.W.3d at 591.

The
trial court submitted numerous self-defense instructions to the jury.  The
trial court instructed the jury, “Upon the law of self-defense, you are
instructed that a person is justified in using force against another when and
to the degree that the actor reasonably believes the force is immediately necessary
to protect the actor against the other’s use or attempted use of unlawful
force.”  See Tex. Penal Code Ann.
§ 9.31(a) (Vernon 2011).  The trial court also instructed the jury that such a
belief is presumed to be reasonable “if the actor knew or had reason to believe
that the person against whom the force was used unlawfully and with force
attempted to enter the actor’s occupied habitation and the actor did not
provoke the person. . . .and was not otherwise engaged in criminal activity at
the time the force was used.”  Id. § 9.31(a)(1)(A).  The trial court
submitted similar instructions with respect to a person’s use of deadly force
in self-defense.  Id. § 9.32(a)(1), (a)(2)(A), (b)(1)(A). 

Appellant
complains about the trial court’s refusal to include instructions that a
person’s belief that the use of force and deadly force is immediately necessary
is presumed to be reasonable if the person knew or had reason to believe that
the person against whom the force was used was committing or attempting to
commit robbery or aggravated robbery.  See Section 9.31(a)(1)(C) and
Section 9.32(b)(1)(C).  A person commits aggravated robbery when he commits
robbery and he causes serious bodily injury to another or uses or exhibits a
deadly weapon.  Tex. Penal Code Ann.
§ 29.03(a)(1), (2) (Vernon 2011).  A person commits robbery if, in the course
of committing theft and with intent to obtain or maintain control of the
property, he intentionally, knowingly, or recklessly causes bodily injury to
another or intentionally or knowingly threatens or places another in fear of
imminent bodily injury or death.  Id. § 29.02(a)(1), (2).  A person
commits theft if he unlawfully appropriates property with the intent to deprive
the owner of the property.  Id. § 31.03(a).

We
have summarized the evidence above.  There was no evidence that Holland and
Tomlinson were committing or attempting to commit robbery or aggravated robbery
against appellant.  Likewise, the record lacks evidentiary support for the contention
that appellant knew or had reason to believe that Holland and Tomlinson were
committing or attempting to commit robbery or aggravated robbery.  Based on the
evidence, appellant could not have formed a reasonable belief that Holland and
Tomlinson were engaging in such conduct.  Because the evidence did not raise
the issues presented by appellant’s requested “robbery” and “aggravated
robbery” instructions, the trial court did not err by refusing to submit those instructions
to the jury.  Ferrel, 55 S.W.3d at 591; Preston v. State, 756
S.W.2d 22, 25 (Tex. App.—Houston [14th Dist.] 1988, pet. ref’d).  Appellant’s
seventh and eighth points of error are overruled.

Trial
Court’s Instruction on Concurrent Sentences

            In
his ninth point of error, appellant contends that the trial court erred by
informing the jury during punishment deliberations that his sentences would run
concurrently.  While deliberating appellant’s punishment, the jury sent the
trial court a note asking “will or can” the two sentences run concurrently.  Over
appellant’s objection, the trial court responded to the jury’s question as
follows:

            Under
the law, the court is required to run the sentences concurrently since the two
cases were tried together.  I refer you to the court’s charge for all of the instructions
you are to follow.

 

Except under
certain circumstances, if an accused has been found guilty of more than one
offense, the offenses arose out of the same criminal episode, and the offenses
were prosecuted in a single criminal action, the sentences assessed for the
offenses must run concurrently.  Tex. Penal
Code Ann. § 3.03(a) (Vernon 2011).  Those certain circumstances do not
apply here.  Thus, the trial court was required to order that appellant’s
sentences for the subject manslaughter and aggravated assault convictions run
concurrently.  In such cases, a trial court does not abuse its discretion by informing
the jury, in response to a question from the jury, that the sentences will run
concurrently.  Haliburton v. State, 578 S.W.2d 726, 729 (Tex. Crim. App.
[Panel Op.] 1979); Dickson v. State, 986 S.W.2d 799, 804 (Tex. App.—Waco
1999, pet. ref’d).  Appellant’s ninth point of error is overruled.

The
Indictments

            In
his fourth point of error, appellant contends that the trial court erred by
denying his motion to quash the indictments because they failed to provide him
fair notice of the manner and means by which he allegedly committed the
offenses.  We review the denial of a motion to quash de novo.  State v. Moff,
154 S.W.3d 599, 601 (Tex. Crim. App. 2004); Jones v. State, 333 S.W.3d
615, 623 (Tex. App.—Dallas 2009, pet. ref’d).  The right to notice is set forth
in both the United States and Texas Constitutions.  U.S. Const. amend. VI; Tex. Const. art. I, § 10; Moff,
154 S.W.3d at 601; State v. Rodgers, 214 S.W.3d 644, 647 (Tex. App.—Eastland
2006, pet. ref’d).  A charging instrument must be specific enough to inform the
accused of the nature of the accusation against him so that he may prepare a
defense.  Moff, 154 S.W.3d at 601; Rodgers, 214 S.W.3d at 647.

Each
of the subject indictments alleged that appellant committed a single offense.  The
indictments alleged alternative manner and means of committing those offenses.  As
stated above, the indictments alleged that appellant committed the offense of
aggravated assault by “intentionally, knowingly, or recklessly caus[ing]
serious bodily injury to [Tomlinson] by hitting him in the head with his hand,
a metal object or unknown object, or by causing him to fall and hit his head,
or by kicking him” and that appellant committed the offense of murder by
“intentionally or knowingly caus[ing] the death of [Holland] by hitting him in
the head with his hand, a metal object or unknown object, or by causing him to
fall and hit his head, or by kicking him.”  The State is allowed to anticipate
variances of proof at trial by pleading alternative manner and means in the
indictment.  Rosales v. State, 4 S.W.3d 228, 236 (Tex. Crim. App. 1999);
Hammock v. State, 211 S.W.3d 874, 879 (Tex. App.—Texarkana 2006, no
pet.); Price v. State, 59 S.W.3d 297, 301 (Tex. App.—Fort Worth 2001, pet.
ref’d).  In these causes, the State alleged alternative manner and means in
clear and concise language.  We conclude that the indictments gave appellant
sufficient notice of the charged offenses to allow him to prepare a defense. 
Appellant’s fourth point of error is overruled.

This
Court’s Ruling

            The judgments of the
trial court are affirmed.

 

 

                                                                                                TERRY
McCALL

                                                                                                JUSTICE

 

August 18, 2011

Publish.  See
Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Kalenak, J.









                [1]Miranda v. Arizona, 384 U.S. 436 (1966).